J-A22042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF RICHARD L. ROBINSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  RICHARD AND JANET GOLDBACH | No. 176 EDA 2017 |

Appeal from the Decree December 8, 2016
in the Court of Common Pleas of Monroe County
Orphans' Court at No.: 164 OC 2011

| | |
|---|---|
| ESTATE OF RICHARD L. ROBINSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  THE ESTATE OF RICHARD L. ROBINSON | No. 206 EDA 2017 |

Appeal from the Decree December 8, 2016
in the Court of Common Pleas of Monroe County
Orphans' Court at Nos.: 164 OC 2011
224 OC 2013

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                **FILED MARCH 06, 2018**

_____

[*] Retired Senior Judge assigned to the Superior Court.

In these consolidated cross-appeals, Appellant, the Estate of Richard L. Robinson ("the Estate"), and Appellee/Cross-Appellants, Richard and Janet Goldbach ("the Goldbachs"), appeal from the decree entered on December 8, 2016, following the orphans' court's decision partially in favor of the Estate and partially in favor of the Goldbachs in these actions below for breach of fiduciary responsibility and for an accounting. For the reasons discussed below, we affirm in part, reverse in part, and remand.

We take the underlying facts and procedural history in this matter from the orphans' court's December 8, 2016 opinion and our review of the certified record.

> These matters come before the [orphans' c]ourt on two separate docket numbers involving the Estate of Richard L. Robinson. The circumstances which led to the current matters are extensive and unfortunate. Barbara and Richard Robinson (hereinafter "[d]ecedent")[1] were a married couple residing in Monroe County, PA. Barbara and the [d]ecedent lived in a Canadensis home called "Nearbrook" where they raised the [d]ecedent's six sons from his first marriage. Prior to her marriage, Barbara had attended college, and at that time introduced her friend, Janet Clinton to Richard Goldbach on a double date. Janet and Richard later married in 1960 and are the [r]espondents in these actions. The Robinsons and [Janet] Goldbach appear to have lost contact with one another until the Goldbachs attended a college reunion at Skytop Lodge in 1983, after which they stopped to visit the Robinsons in nearby Canadensis. The Goldbachs then continued to visit the Robinsons several times over the years.
>
> In 2003, Richard Goldbach leased an automobile for Barbara to use after noticing her car was unreliable. He did this in part out of gratitude to Barbara for introducing him to his wife and

_____

[1] We use the term "decedent" to refer solely to Richard Robinson.

because he had enjoyed a financially successful career. In October 2007, Barbara visited the Goldbachs for a week in London, England. From that point on, Barbara and Richard began an email correspondence which would become the foundation for the matters [] before the [orphans' c]ourt.

While visiting the Goldbachs in London, Barbara had expressed despair over the [d]ecedent's health and the couple's financial situation. The Robinsons had taken out a reverse mortgage on the Nearbrook property and were unsure how long the money would last. The [d]ecedent was suffering from dementia, leaving Barbara to handle the couple's finances. She had no experience doing this in the past. Barbara struggled with the task of managing finances and needed help. During the London trip Barbara informed Janet Goldbach that the Robinsons' financial situation and [d]ecedent's health were so dire that she and the [d]ecedent were contemplating suicide. Upon learning this from his wife, Richard Goldbach volunteered to help Barbara with her financial situation, not only because of the threat of suicide, but also because Barbara was responsible for introducing him to his wife, for which he was forever in her debt.

Barbara then supplied Richard Goldbach with documents relating to the Robinsons' finances. It was apparent that the Robinsons were living beyond their means, and unable to continue to afford the continued maintenance of Nearbrook and the reverse mortgage. Sometime in November 2007, Richard called Barbara and offered to provide financial assistance to the Robinsons. Richard leased a new vehicle for Barbara to use and sent her money to help with the deficiency between the Robinsons' income and expenditures. A ten[-]year plan was developed in which the Goldbachs would lend the Robinson[s] approximately $1,000 a month in the hope they could remain at Nearbrook. Barbara also had Richard contact another friend of hers, Reuben Taylor, for additional support in developing a financial plan. Reuben Taylor believed that the condition of Nearbrook would render it almost impossible for the Robinsons to maintain it in the future. All parties eventually agreed that the Robinsons' continued ownership of Nearbrook was not feasible.

Richard Goldbach suggested various options to Barbara that included selling Nearbrook, but retaining a life interest to rent a portion of the property; selling Nearbrook and renting somewhere else; selling Nearbrook and moving closer to the Goldbachs in

- 3 -

Virginia. Another option was then offered to Barbara in which the Goldbachs would purchase a home for the Robinsons to live in rent[-]free, Nearbrook would be sold, and the proceeds of the sale would be signed over to Richard Goldbach to hold and manage for the Robinsons' expenses not covered by the housing offer. This was the option eventually pursued by the parties. Janet Goldbach then purchased a condo at Labar Village in Stroudsburg, Pennsylvania for the Robinsons to live in on May 4, 2009. The Goldbachs paid a purchase price of $167,000, together with closing costs of $5,498.75. Nearbrook was later sold on May 22, 2009, netting $157,764.39 for the Robinsons after payment of closing expenses and the reverse mortgage. This money was signed over to Richard Goldbach and deposited into his and Janet's bank account at Farmer's Bank in Virginia. Until Nearbrook was sold, the Goldbachs continued to send Barbara money every month as agreed to in 2007.

After the sale of Nearbrook the proceeds were given to the Goldbachs to maintain and use for the benefit of the Robinsons. In emails exchanged between the parties, Barbara referred to the money as belonging to Richard Goldbach. Other evidence indicated Barbara could take back the remainder of the Nearbrook proceeds at any time, but the Goldbachs would withhold further guidance or financial help. The amount of money that remained from the Nearbrook proceeds following the [d]ecedent's death and the way in which it was invested remains in dispute. Emails between the parties indicate [that] between $142,000 and $154,000 existed at various times prior to the [d]ecedent's death. Richard Goldbach testified that in his contact with Barbara he inflated the actual amount remaining in order to alleviate some of Barbara's anxiety about running out of money. There was also testimony that the Nearbrook money was to be invested at a 3% return, but was instead returning less than 1% in the Goldbachs' account.

On June 25, 2011, Barbara Robinson shot her husband and took her own life at the home in Labar Village. [Richard Robinson] survived his wife by one day before succumbing to his injuries. Although there was some testimony that wills for Barbara and [Richard Robinson] had been drawn up, or at least contemplated by the Robinsons, no wills have been presented for probate. Decedent's son Bradley Robinson (hereinafter "[p]etitioner") was issued [l]etters of [a]dministration by the Monroe County Register of Wills on August 17, 2011. The heirs of the Estate are the

[d]ecedent's five surviving sons (one son having died two (2) years prior to the [d]ecedent).

The Estate hired a computer expert to retrieve and print all emails between Richard Goldbach/Rueben Taylor/Barbara Robinson. These emails were delivered to [p]etitioner's counsel on August 18, 2011. The Estate was aware that the Nearbrook proceeds were endorsed over to Richard Goldbach upon review of these emails in August 2011. On November 10, 2011, the [d]ecedent's Estate filed a [p]etition to [c]ompel [a]ccounting of the funds which were being held by the Goldbachs []. This matter [wa]s docketed at 164 OC 2011. The Goldbachs, through counsel, sent supporting documentation of the accounting entries to [p]etitioner's counsel on November 22, 2011. A verified accounting was later filed by the [Goldbachs] on October 29, 2012. A breach of fiduciary duty claim was filed on December 27, 2013, and is docketed at 224 OC 2013. [The orphans' court] note[s] the parties waived issues related to the Deadman's Act, and all Exhibits were admitted without objection to the Act or hearsay issues.

(Orphans' Court Opinion, 12/08/16, at 1-5).

Hearings on the matter took place on December 16, 2015, February 16, 2016, May 13, 2016, and July 20, 2016. On December 8, 2016, the orphans' court issued an opinion and decree. It held that the statute of limitations barred the Estate's breach of fiduciary duty claim and, nevertheless, the Estate had not met its burden of proving such a breach. (Decree, 12/08/16, at 1). Further, it granted, in part, the Estate's objection to the accounting and awarded it $90,689.65 from the sale of Nearbrook proceeds. (*See id.*). Both parties filed timely notices of appeal.[2]

_____

[2] All parties timely complied with the requirements of Pennsylvania Rule of Appellate Procedure 1925. *See* Pa.R.A.P. 1925(b). The orphans' court filed

- 5 -

On appeal, the Estate raises the following eight questions:

[A.] Did the [o]rphan[s' c]ourt err in concluding that the claim of breach of fiduciary duty was barred by the statute of limitations, a finding not supported by the facts or law?

[B.] Did the [o]rphan[s' c]ourt err in concluding there was no harm proved by breach of fiduciary duty shown, because the [c]ourt made the Estate "whole" on the accounting side of the case, a finding not supported by the facts or law?

[C.] Did the [o]rphan[s' c]ourt err by not finding that [the Goldbachs'] filing of an accounting wherein they claimed monies were due to them, constituted harm as a result of breach of fiduciary duty regardless of the [c]ourt's holding on the accounting side of the case?

[D.] Did the [o]rphan[s' c]ourt err in not finding that the Estate suffered damage/loss (court costs, filing fees, legal fees, financial damages) as a result of the breach of fiduciary duty proved?[]

[E.] Did the [o]rphan[s' c]ourt err in its conclusion that the monies given to the Robinsons by the Goldbachs from November 2007 to May 2009 (prior to the sale of their home) were loans and not gifts?

[F.] Did the [o]rphan[s' c]ourt err by citing only [d]ecedent's hearsay testimony (repeated by [Appellee Richard] Goldbach), to support its conclusion that Barbara Robinson agreed to repay monies advanced to her circa 2007?

[G.] Did the [o]rphan[s' c]ourt err on page [fifteen] of its opinion stating with improper citation, that there ". . .was testimony that Barbara Robinson did not want any financial harm to come to Janet Goldbach. . ." where there was no such testimony or document, but only a self-serving hearsay

_____

a statement finding that it had adequately addressed all issues raised in the Rule 1925(b) statements in its December 8, 2016 opinion. *See* Pa.R.A.P. 1925(a).

statement made by [Appellee Richard] Goldbach about what [d]ecedent said to him?

[H.] Did the [o]rphan[s' c]ourt err in giving too much weight to Exhibit 63 which [the Goldbachs] referred to as the "foundation of the whole transaction" when this document was the only exhibit containing no proof on its face that it was communicated to anyone and was not responded to?

(The Estate's Brief, at 2-3).[3]

On cross-appeal, the Goldbachs raise the following five questions:

A. Did Barbara Robinson's agreement by acquiescence not to hurt Janet Goldbach, as evidenced by her acceptance of financial support in 2007, extend to (a) her agreement to accept a rent-free tenancy in a property Janet Goldbach purchased and (b) the losses Janet Goldbach suffered on the sale of that property after Barbara Robinson's suicide?

B. Did the parties discus[s] the plan to sell Nearbrook in 2007?

C. Did [the Goldbachs] set forth case law in support of their defense that any claim for repayment of the Nearbrook

_____

[3] Despite raising eight questions in its statement of the questions involved, The Estate only includes six issues in its argument, contrary to our rules of appellate procedure. (**See** the Estate's Brief, at 12–30); **see also** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]"). Specifically, in the argument section, Appellant omit questions C and D as expressed in the statement of the questions involved, stating that it will address issues B, C, and D together. (**See** the Estate's Brief, at 2 n.1, 22). Thus, there is no question C in the argument section, and what are labeled as questions E and F in the statement of the questions involved are questions D and E in the argument section. (**See id.** at 2-3, 22, 26). The argument section does not include a question F and concludes with questions G and H, which is as they are stated in the statement of questions involved. (**See id.** at 3, 27, 29). Nonetheless, despite the difficulties this has caused, we will address the issues. **See Donahue v. Fed. Express Corp.**, 753 A.2d 238, 241 n.3 (Pa. Super. 2000).

proceeds is barred by the doctrine of [a]greement by [a]cquiescence?

D. Was there substantial evidence to justify rejecting unrebutted testimony and Barbara Robinson's express written acknowledgement that Nearbrook proceeds were turned over to [Appellee] Richard Goldbach unconditionally?

E. Do the doctrines of promissory estoppel or unjust enrichment apply where Barbara Robinson accepted Janet Goldbach's offer to buy the LaBar Village property with the expectation she would live in there until her mid-nineties and the evidence shows that at the time they moved into LaBar Village, the Robinsons had devised a joint-suicide plan which they carried out only two years later causing substantial economic loss to the [Goldbachs ?]

(The Goldbachs' Brief, at 2-3).[4]

Both parties appeal from the decree of the orphans' court. Our scope and standard of review are settled.

Our standard of review of the findings of an Orphans' Court is deferential.

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.

However, we are not constrained to give the same deference to any resulting legal conclusions.

---

[4] Similarly, to the Estate, the Goldbachs' argument section does not match their statement of the questions involved. (**See** the Goldbachs' Brief, at 2-3; 24–36)/; **see also** Pa.R.A.P. 2119(a). Again, despite the difficulties caused, we will address their issues. **See Donahue**, **supra** at 241 n.3.

The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law.

This Court's standard of review of questions of law is *de novo*, and the scope of review is plenary, as we may review the entire record in making our determination. When we review questions of law, our standard of review is limited to determining whether the trial court committed an error of law.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016), *appeal denied*, 145 A.3d 166 (Pa. 2016) (citations and quotation marks omitted).

The Estate first claims that the orphans' court erred in finding that the statute of limitations barred its breach of fiduciary duty claim. (*See* the Estate's Brief, at 12-17). We disagree.

The statute of limitations for a breach of fiduciary duty claim is two years. *See* 42 Pa.C.S.A. § 5524(3) and (7). In discussing statutes of limitations, this Court has specifically noted our policy that favors "the strict application of statutes of limitation." *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441 (Pa. Super. 2003), *affirmed*, 881 A.2d 1266 (Pa. 2005) (citation omitted). Our Supreme Court has stated:

As a matter of general rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period. Thus, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time. Once the prescribed statutory period has expired, the party is barred from

bringing suit unless it is established that an exception to the general rule applies which acts to toll the running of the statute.

The "discovery rule" is such an exception, and arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause. Thus, in a case of subsurface injury in which, unknown to the plaintiff, the defendant removes coal from his land via access originating on the defendant's land, the inability of the plaintiff, despite the exercise of diligence, to know of the trespass, tolls the running of the statute, for no amount of vigilance will enable him to detect the approach of a trespasser who may be working his way through the coal seams underlying adjoining lands, and until such time as the plaintiff discovers, or reasonably should have discovered, the trespass, the running of the statute is tolled. Likewise, in a case of medical malpractice involving the failure of a surgeon to remove an implement of surgery, it is the inability of the plaintiff to ascertain the presence of the offending implement which prevents the commencement of the running of the statute, for [c]ertainly he could not open his abdomen like a door and look in; certainly he would need to have medical advice and counsel. The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury. A court presented with an assertion of applicability of the "discovery rule" must, before applying the exception of the rule, address the ability of the damaged party, exercising reasonable diligence, to ascertain the fact of a cause of action.

*Pocono Int'l. Raceway, Inc. v. Pocono Products, Inc.*, 468 A.2d 468, 471

(Pa. 1983) (citations, emphasis, and quotation marks omitted).

In its December 8, 2016 opinion, the orphans' court thoroughly and

correctly explained the basis of its finding that the statute of limitations barred

the Estate's breach of fiduciary duty claim as follows.

The first issue before the [orphans' c]ourt is whether or not the Estate's claim for a breach of fiduciary duty against the [Goldbachs] is barred by the applicable statute of limitations. Just after Bradley Robinson was appointed [a]dministrator, the Estate began looking into the possibility that funds had been mishandled

by the [Goldbachs]. On or about August 18, 2011, a computer expert, John Conti, delivered to [the Estate's] attorney copies of emails from Barbara's computer relating to the [Goldbachs]. (**See** Petitioner's Exhibit 8, Agreement of Bradley C. Robinson for Retention of John Conti's Services, 8/04/11 at 1; N.T. Hearing, 12/16/15, at 43-44). Bradley Robinson and his counsel read these emails in August 2011. (**See** N.T. Hearing, 12/16/15, at 67-68, 103). [The Goldbachs] argue, that because of the contents of the emails, it was at this point that the [Estate] should have been aware that the funds from Nearbrook were held by the Goldbachs, who stated they used it all to assist the Robinsons. A [p]etition to [c]ompel [a]ccounting in this matter was then filed on November 10, 2011. Attached to that accounting is a copy of the check for the sale of Nearbrook which was made out to Richard Goldbach. (**See** Petition to Compel Accounting, 11/10/11, Exhibit A; N.T. Hearing, 12/16/15, at 111, 120). [Bradley Robinson] admitted he knew the Nearbrook proceeds were deposited to the Goldbachs' Virginia bank account when the [p]etition for [a]ccounting was filed in November, 2011. (**See** N.T. Hearing, 12/16/15, at 111-113). The [b]reach of [f]iduciary [d]uty [c]laim was filed on December 27, 2013. [The Estate] argues that the statute of limitations should not have begun running until [the Goldbachs] filed their verified accounting with the [orphans' c]ourt on October 29, 201[2]. [The Estate] further argues that without the accounting [it] was without knowledge that a fiduciary breach had occurred that would warrant a separate petition. [The Goldbachs] counter that there is no information in the [b]reach of [f]iduciary [c]laim that was not already included in the [p]etition for [a]ccounting, and therefore the grounds for a breach of fiduciary claim had existed and were known at the time the accounting was requested in November 2011.

Actions for [b]reach of [f]iduciary [d]uty are subject to a two year statute of limitations under 42 Pa. C.S.A § 5524(7) which specifically covers "any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud." [**See** 42 Pa.C.S.A. § 5524(7).] The party bringing the claim "is under a duty to use all reasonable diligence to be properly informed of the facts and the circumstances . . . and to institute suit within the prescribed period." **Pocono Int'l Raceway,** [**supra** at] 471 ) (citations omitted). Under normal circumstances, the statute of limitations begins as soon as the

right to bring and sustain a claim arises. ***See id.*** One exception to this general procedure is the "discovery rule" when a party is unable to know of an injury or its cause despite due diligence. ***Id.*** "Mere mistake, misunderstanding or lack of knowledge is not sufficient to toll the running of the statute." ***Taylor v. Tukanowicz***, 435 A.2d 181, 183 (Pa. Super. 1981) [(citation and quotation marks omitted)]. When the injury is not immediately known, the statute of limitations will only begin to run when the discovery of it is "reasonably possible." ***Id.***

[The Goldbachs] assert that the [Estate] was aware of the basis for the breach of fiduciary claim by at least August 2011, if not before the Robinsons' deaths. [The Goldbachs] cite an email from August 23, 2009[,] in which Barbara Robinson claimed that her step-sons knew that the money from Nearbrook was given to Richard Goldbach, and they "kn[e]w the whole story". (Respondent's Exhibit 30, E-Mail from Barbara Robinson to Richard Golbach, 8/23/09 at unnumbered page 1). [Bradley Robinson] admitted the August 2009 email was written by Barbara Robinson, but that she was "overwhelmed" at this period and that his parents did not discuss finances with him or his siblings. (N.T. Hearing, 12/16/15, at 45; ***see also id.*** at 45-46). [Bradley Robinson] also claims to have not been aware of the transfer of the Nearbrook proceeds to the [Goldbachs] until after the [d]ecedent's death. (***See id.*** at 29). Based upon [Bradley Robinson's] testimony and the context and tone of other emails written by Barbara Robinson it is believable that the Robinsons' sons were unaware of their parents' financial arrangements with the Goldbachs until after their deaths. Other evidence and credible testimony shows that the Robinsons did not appear particularly close enough to any of the children to discuss financial matters, and that the children did not assist their parents with financial issues or act to alleviate their parents' concerns. (The exception being a payment by one son of $4,400 for an oil bill in August 2007 on behalf of his parents which went unexplained at time of hearing). Although [Bradley Robinson] lived at Nearbrook for a short period of time prior to its sale, paid some rent and cooked some meals for his parents, he was generally unaware of his parents' financial situation, was unable to provide assistance if asked, and there was no evidence the Robinsons confided in their sons. Therefore, we doubt [Bradley Robinson] knew prior to the deaths of his parents.

Next it must be determined if the statute of limitations should have begun once the [Estate] either received the relevant emails from Barbara's computer in August 2011, or in November 2011[,] when [the Goldbachs'] attorney provided more detailed information, or when the [Goldbachs] filed a verified accounting in October 2012. By [Bradley Robinson's] own admission, the Estate's attorney received copies of Barbara's emails on August 18, 2011. (*See* N.T. Hearing, 12/16/15, at 44). [The Goldbachs] argue that all of the information contained within the two petitions in this matter were known to the Estate by August 2011 through those emails. The only noticeable difference in the allegations between the two petitions is that the [p]etition for [a]ccounting claims the [Goldbachs] purchased the Labar Village property as a tax write-off, while the [b]reach of [f]iduciary [d]uty claim asserts that the Labar Village property was improperly purchased with monies from the sale of Nearbrook. However, it was clear from the evidence that the [Goldbachs] purchased the Labar Village property with their own or borrowed monies, and not the Nearbrook proceeds. In fact, Nearbrook was sold by the Robinsons after the Labar Village property was purchased by the Goldbachs.

[The Estate] then states that [it] was not aware of a possible fiduciary breach until [the Goldbachs] filed their accounting. However, Paragraph [fifteen] of the November 1[0], 2011 [p]etition for [a]ccounting alleges that the [Goldbachs] co-mingled the Estate's funds from the sale of Nearbrook by depositing them in [the Goldbachs'] own bank account. (*See* Petition to Compel Accounting, ¶ 15). Such action could constitute a breach of fiduciary duty. Therefore, at the very least, [the Estate] was aware of facts indicating a possible breach of fiduciary duty as of November 1[0], 2011 when making this allegation. This information was also available and readily apparent in several of the email exchanges between Barbara and Richard Goldbach. These emails were known to [the Estate] in August 2011. The [Estate] also attached a copy of the check from the sale of Nearbrook, which had been signed over to Richard Goldbach, as Exhibit "A" to the [p]etition [to Compel a]ccounting. [Bradley Robinson] admitted he was aware of these facts and of the deposit to Richard and Janet Goldbach's Virginia bank account prior to filing the [p]etition in November 2011. (*See* N.T. Hearing, 12/16/15, at 111-13). . . . . [T]he co-mingling of funds alone would be grounds for a breach of fiduciary duty claim. Based upon this, it was reasonably possible for the [Estate] to have discovered the

grounds for a fiduciary breach claim beginning in August 2011 and definitely by November 1[0], 2011 when the [p]etition for [a]ccounting was filed. The actual [b]reach of [f]iduciary claim was not filed until December 27, 2013, more than two years after it was reasonable to discover the issue.

(Orphans' Ct. Op., at 5-9) (citation formatting and record citation formatting altered).

Our review of the record shows that the orphans' court's factual finding that the Estate knew or should have discovered the grounds for a breach of fiduciary responsibility claim by, at the latest, November 2011, is clearly supported by the evidence. **See Fiedler**, **supra** at 1018. Moreover, we discern no error of law in the orphans' court declining to apply the discovery rule beyond November 2011. **See Crouse v. Cyclops Indus.**, 745 A.2d 606, 611 (Pa. 2000) (citation omitted) (explaining discovery rule only applies until point that party knows or reasonably should know of injury). The Estate's first claim lacks merit.

In its second claim, the Estate argues that the orphans' court "err[ed] in concluding [that] there was no harm proved by breach of the fiduciary duty[.]" (The Estate's Brief, at 18) (unnecessary capitalization omitted). However, because we have found that the orphans' court did not err in holding

that the statute of limitations barred the Estate's breach of fiduciary responsibility claim, we need not address this issue.[5]

In its fifth claim, the Estate claims that the orphans' court erred "in its conclusion that the monies given to [decedents] by fiduciary Goldbach from Nov. 2007 to May 2009 were loans and not gifts[.]" (The Estate's Brief, at 22) (unnecessary capitalization omitted); (*see id.* at 22-26). We disagree.

Initially, we note that, to the extent that the Estate is complaining that the orphans' court relied on evidence admitted in violation of the Deadman's Act and on hearsay evidence, (*see* the Estate's Brief, at 23), it has waived the claim. The orphans' court specifically states in its decision that "the parties waived issues related to the Deadman's Act, and all Exhibits were admitted without objection to the Act or hearsay issues." (Orphans' Ct. Op., at 5). The record supports this statement and the Estate cannot now complain that the trial court relied on exhibits that it agreed to admit. (*See* N.T. Hearing, 12/16/15, at 156-58; N.T. Hearing 5/13/16, at 41; N.T. Hearing 7/20/16, at 63); *see also* Pa.R.A.P. 302(a); *Samuel-Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 45-46 (Pa. 2011).

_____

[5] The Estate's third and fourth claims as delineated in the statement of questions involved also concern the merits of its breach of fiduciary duty claims. However, as discussed *supra*, the Estate discussed these together with the second issues in its brief, thus we need not address them because of our ruling on the statute of limitations issue.

- 15 -

Moreover, our review of the record demonstrates that the orphans' court's holding that the monies in question were a loan, not a gift, (**see** Orphans' Ct. Op., at 15, 21), is well-supported by the evidence of record. The record reflects that in late 2007, the Goldbachs offered to lend Barbara Robinson funds to offset the difference between her income and expenses. (**See** Respondents' Exhibit 63, Letter from Richard Goldbach to Barbara Robinson, 10/07/03, at unnumbered pages 1-2; N.T. Hearing, 5/13/16, at 40-44, 54-55). The nature of the transaction was delineated in an e-mail sent by Richard Goldbach to Barbara Robinson in response to her request. (**See** Respondents' Exhibit 5, E-Mail from Barbara Robinson to Richard Goldbach, 11/06/07, at unnumbered page 1; Respondents' Exhibit 6, E-Mail from Richard Goldbach to Barbara Robinson, 11/14/07, at unnumbered pages 1-3; Respondents' Exhibit 7, E-Mail Chain Between Barbara Robinson and Richard Goldbach, 11/15/07, at unnumbered page 5; Respondents' Exhibit 63, **supra**). These letters and e-mails specifically state that the monies were loans, mentions Barbara Robinson's intent to keep this on a "business-like" basis, and her wish not to be the cause of any financial harm to Janet Goldbach. (**Id.**). Both Richard Goldbach and Reuben Taylor testified as to their understanding of the events of 2007 and the trial court clearly credited their testimony. (**See** Orphans' Ct. Op., at 15-17, 21; N.T. Hearing, 5/13/16, at 40-41, 54-55, 103).

While the Estate points to several e-mails that it contends support its contention that the monies were gifts not loans, (**see** the Estate's Brief, at 24-25), it fails to explain how these exhibits support its contentions. (**See id.** at 25-26). We have reviewed them and are unable to discern what statements in these exhibits support the Estate's contention that the monies sent to Barbara Robinson in 2007 through 2009 were gifts, not a loan. We remind the Estate that it is not this Court's responsibility to comb through the record seeking the factual underpinnings of its claim. **See Commonwealth v. Mulholland**, 702 A.2d 1027, 1034 n.5 (Pa. Super. 1997) ("In a record containing thousands of pages, this [C]ourt will not search every page to substantiate a party's incomplete argument."). Thus, the factual finding of the orphans' court that the monies advanced between November 2007 and May 2009 were loans, not gifts, is supported by the record and we see no abuse of discretion in this finding. **See Pocono Int'l. Raceway**, **supra** at 471. The Estate's fifth claim lacks merit.

In its sixth claim, the Estate contends that the orphans' court erred by only relying on hearsay testimony in concluding that Barbara Robinson agreed to repay funds. (**See** the Estate's Brief, at 26). However, as discussed above, the Estate agreed to waive all objections to hearsay. (**See** N.T. Hearing, 12/16/15, at 156-58; N.T. Hearing, 7/20/16, at 63) Thus, it cannot complain now that the orphans' court erred in relying upon it. **See** Pa.R.A.P. 302(a); **Samuel-Bassett**, **supra** at 45-46. The Estate's sixth claim lacks merit.

In its seventh claim, the Estate argues that the orphans' court erred on page fifteen of its opinion by incorrectly using "*Id*" in that portion of its decision. (The Estate's Brief, at 3; *see also id.* at 27-29). It further complains that the trial court erred in stating that there was testimony that Barbara Robinson did not want harm to come to Janet Goldbach when no such testimony existed except for the self-serving testimony of Richard Goldbach. (*See id.* at 27-29).

Initially, we note that the Estate has failed to point to any law that supports an argument that this Court can overturn an orphans' court decision following a hearing because of alleged citation errors in its opinion. Moreover, while Barbara Robinson, of course, could not testify as to her statements, there was evidence of record that she did not want harm to come to Janet Goldbach. (*See* Respondents' Exhibit 63, *supra*; N.T. Hearing, 5/13/16, at 44). We again note that the Estate cannot now complain about the orphans' court's reliance on hearsay evidence when it agreed to its admission. Lastly, as discussed above, the record amply demonstrates that the monies advanced by the Goldbachs to Barbara Robinson between November 2007 and May 2009 were loans, not gifts. The Estate's seventh claim lacks merit.

In its final claim, the Estate maintains that the orphans' court gave too much weight to Respondents' Exhibit 63 in concluding that the advanced monies were loans and not gifts. (*See* The Estate's Brief, at 29-30). We find the claim waived.

In its brief, the Estate fails to cite to the objectionable portions of the orphans' court opinion. (***See id.***). Thus, it is not readily apparent to us to what portions of the opinion the Estate is objecting. This Court will not act as counsel and will not develop arguments on behalf of an appellant. ***See Bombar v. West Am. Ins. Co.***, 932 A.2d 78, 94 (Pa. Super. 2007). When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we can dismiss the appeal entirely or find certain issues to be waived. ***See*** Pa.R.A.P. 2101. Because the Estate has failed to develop this issue, it waived it.[6] ***See id.***; ***see also Bombar***, ***supra*** at 94; ***Jones v. Jones***, 878 A.2d 86, 90 (Pa. Super. 2005).

In their first two issues, the Goldbachs claim that Barbara Robinson's agreement by acquiescence to the terms of their financial dealings estops the Estate from seeking return of the monies. (***See*** The Goldbachs' Brief, at 24-32). We agree.

Our Supreme Court described the doctrine of agreement by acquiescence thusly:

_____

[6] In any event, our review of the record demonstrates that the trial court twice cites to Respondents' Exhibit 63 in discussions of rulings that ultimately **favored** the Estate. (***See*** Orphans' Ct. Op., at 16-17, 20). The only other mention of Respondents' Exhibit 63 is in a string cite to various exhibits and notes of testimony relied upon by the trial court in concluding that the monies advanced between 2007 and 2009 were loans, not gifts. (***See id.*** at 21). There is nothing in this citation that demonstrates that the trial court placed undue weight on Respondents' Exhibit 63 or even placed any particular weight on it as opposed to the others pieces of evidence noted in the citation. Thus, even if the Estate had not waived the claim, it lacks merit.

- 19 -

An estoppel may be raised by acquiescence, where a party aware of his own rights sees the other party acting upon a mistaken notion of his rights. The rule is well recognized that when a party with full knowledge or with sufficient notice or means of knowledge of his rights and of all the material facts, remains inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable. . . . [I]t was stated by this [C]ourt: It would be most unreasonable to permit an employee to receive his pay without objection or dissent, from time to time at a fixed rate, for a considerable period, and thereafter present a claim for additional compensation. If the amount received was not satisfactory the employees should have quit work, or raised an objection then and there; so that the department would have been put upon notice, and would have exercised its option of meeting the demand, or finding some one else to do the work for the rate of pay deemed sufficient. We can only look upon the continuance in employment, as an expression of satisfaction by the workmen with the amount of the compensation; and the receipt of payments every two weeks throughout the whole period, is to be deemed an estoppel against the assertion of any claim for additional compensation at this time. Under the circumstances, continuance in the employment of the department from day to day can only be regarded as acquiescence in the rate of wages fixed by the department.

*In re Kennedy's Estate*, 183 A. 798, 801 (Pa. 1936) (citations and quotation marks omitted).

Here, the Goldbachs contend that the orphans' court erred in not finding that Barbara Robinson "accepted a lifelong rent-free and expense-free tenancy in a home purchased by [them] in exchange for the proceeds of the Nearbrook sale." (The Goldbachs' Brief, at 24). They further argue that the orphans' court mistakenly found that the 2007 through 2009 loans were distinct agreements temporally separated, a conclusion that the orphans' court used to support its finding that Barbara Robinson did not have any concerns about

future financial harm to Janet Goldbach regarding home purchase in 2009. (**See id.** at 25-31). Again, we agree.

Our review of the relevant portions of the record demonstrates that these were not two separate transactions but rather a single series of negotiations. Namely, while the parties initially believed that the Robinsons could remain in Nearbrook, they almost immediately concluded that this was not possible; the delay in the Robinsons' departure was caused not by a change of plans but rather by difficulties in selling Nearbrook. Specifically, we note that in the initial 2007 e-mail, Richard Goldbach believed that Barbara Robinson could remain in Nearbrook if her income was bolstered by loans (in response to Barbara Robinson's wish that things be conducted on a business-like basis and Janet Goldbach not be harmed) from Janet Goldbach, but he changed his mind within approximately one week. (**See** Respondents' Exhibit 63, **supra** at unnumbered pages 1-2; Respondents' Exhibit 6, **supra** at unnumbered page 1 ¶¶ 2-4 (discussing need to sell Nearbrook as soon as possible and difficulties in so doing)). The November 14, 2007 e-mail specifically noted that one possibility for the future was that the Goldbachs, specifically Janet Goldbach, would purchase a retirement home for the Robinsons to live in rent-free during their lifetimes. (**See** Respondents' Exhibit 6, **supra** at unnumbered page 2 ¶ 7). In his testimony, Reuben Taylor confirmed both that Barbara Robinson did not want Janet Goldbach to be harmed financially and that, while Richard Goldbach initially wanted the

Robinsons to stay in Nearbrook, he quickly realized that this was not feasible. (**See** N.T. Hearing, 7/20/16, at 89-92; **see also** N.T. Hearing, 5/13/16, at 55-58). Thus, the orphans' court was incorrect in its conclusion that, in 2007, the parties were not discussing the sale of Nearbrook. (**See** Orphans' Ct. Op., at 15-16).

Further, the record reflects that Barbara Robinson willingly accepted all financial assistance offered by the Goldbachs. (**See** N.T. Hearing, 5/13/16, at 73-74; **see also** N.T. Hearing, 7/20/16, at 86). In accordance with their agreement, the Goldbachs loaned Barbara Robinson $1,000.00 per month between November 2007 and the sale of Nearbrook in May 2009. (**See e.g.**, Respondents' Exhibit 14, E-Mail 1/27/08, at unnumbered page 1; **see also** N.T. Hearing, 5/13/16, at 71-73). In furtherance of the agreement, she agreed to turn over unconditionally the proceeds from the sale of Nearbrook to Richard Goldbach in return for lifetime rent-free and expense-free tenancy at Labar Village, in the condominium owned by Janet Goldbach, with all remaining bills to be paid by Richard Goldbach from the sale proceeds. (**See** Respondents' Exhibit 24, E-Mail from Richard Goldbach to Barbara Robinson, 4/04/09, at unnumbered pages 1-2 (discussing: (1) how to allocate various expenses between parties; (2) that Barbara Robinson would turn over proceeds from Nearbrook sale unconditionally to Richard Goldbach; (3) monies would be placed in Goldbachs' bank account; (4) monies to be used to pay all Barbara Robinson's remaining bills; (5) iterating that Barbara

Robinson needed to stop giving away money; and (6) if she requested, Goldbachs would return remaining monies, but would no longer pay her bills and manage her finances); *see also* N.T. Hearing, 5/13/16, at 81-92).

Barbara Robinson confirmed her acceptance of this proposal by signing over the Nearbrook proceeds to Richard Goldbach. (*See* Petition to Compel Accounting, *supra* at Exhibit A; N.T. Hearing, 5/13/16, at 92). Less than five months later, Barbara Robinson expressed discomfort with the situation, acknowledging that the money belonged to Richard Goldbach, but feeling uncomfortable with having to ask him for money. (*See* Respondents' Exhibit 29, E-Mail Chain from Richard Goldbach to Barbara Robinson, 7/18/09, at unnumbered page 2). Richard Goldbach again reminded Barbara Robinson that if she did not agree with his method of handling her finances, he would return the monies. (*See id.* at unnumbered page 1; *see also* N.T. Hearing, 5/13/16, at 93-95). There is no evidence of record that Barbara Robinson ever sought return of the monies prior to her death.

In *Kennedy's Estate*, *supra*, a father and his two sons entered into a business. *See Kennedy's Estate*, *supra* at 799. The business arrangement lasted for many years without objection from the sons. *See id.* at 799-800. After the father's death, the sons filed a claim against the estate for a reimbursement of losses incurred by the business, which had been originally charged against them on the basis of the business agreement. *See id.* On appeal, our Supreme Court declined to address the merits of the underlying

dispute of whether the business agreement created a partnership or if the sons were profit-sharing employees of their father. *See id.* at 800. Instead, the Court held that the sons were obligated to raise their objections close in time to when the losses were first assessed against them, and by waiting to do so, they were precluded from raising the claim against the estate. *See id.* at 801. Specifically, the Court stated, "[t]he time to have raised the question now before us was during the lifetime of [the father], not after his death." *Id.*

Here, as discussed in detail above, beginning in 2007 and ending in 2011, Barbara Robinson agreed to an on-going financial arrangement that would both protect Janet Goldbach from any future financial difficulties, by allowing the Labar Village property to revert to her after the Robinsons' death, and assist Barbara Robinson. She accepted loans of $1,000.00 a month from November 2007 through May 2009. In late 2007, she agreed to place Nearbrook on the market; she subsequently agreed to turn over the proceeds from that sale unconditionally to Richard Goldbach. In return for these monies, the Goldbachs agreed to pay for the Labar Village residence and its related expenses, and to pay Barbara Robinson's bills for life.[7] As discussed

_____

[7] It is evident that the proceeds of approximately $157,000.00 would only have lasted for a few years, particularly given that Barbara Robinson was obligated to repay the approximately $23,000.00 loaned to her by the Goldbachs. Clearly, at some point, Richard Goldbach would have needed to pay her bills out of his own pocket. Thus, it is only because of Barbara Robinson's decision to kill her husband and commit suicide in 2011, that there are any remaining funds.

above, Barbara Robinson knew that she could seek return of the remaining funds at any time, but would then have to manage her own finances and pay her own bills. (**See** Respondents' Exhibit 24, E-Mail from Richard Goldbach to Barbara Robinson, 4/04/09, at unnumbered pages 1-2). She chose not to repudiate the agreement.

Thus, the relevant issue was not the underlying merits of whether the monies advanced with respect to the Labar Village residence was a loan or a gift, but whether the Estate is now barred from objecting because Barbara Robinson acquiesced to the financial arrangement set by Richard Goldbach. **See Kennedy's Estate**, **supra** at 800-01. We find that the trial court made a fundamental error of law in not holding that by not objecting during her lifetime, Barbara Robinson forfeited any claim on behalf of the Estate for the proceeds of Nearbrook. **See Pocono Int'l Raceway**, **supra** at 471; **Kennedy's Estate**, **supra** at 801; **see also Commonwealth ex. rel. City of Philadelphia v. Public Serv. Mut. Ins. Co.**, 247 A.2d 636, 640 (Pa. 1968) (relying on **Kennedy's Estate** for proposition that appellants were not entitled to return of forfeited bail monies where they were aware of facts underlying forfeiture and paid judgments without protest, thus they could not later seek return of funds).

Because we find that Barbara Robinson's agreement by acquiescence estopped the Estate from seeking return of the remaining proceeds from the sale of the house after her death, we need not address the Goldbachs'

remaining claims. Accordingly, for the reasons discussed above, we affirm the decree in part, reverse in part, and remand for entry of a decree consistent with this opinion.

Decree affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/18